Hasbro is the maker of Monopoly. In the late 1990s, Hasbro sought to redesign Monopoly for the new millennium. And it designed two different versions of a Monopoly game. Counselor, you can use your time however you want. It's your 15 minutes of fame. But given the shotgun nature of your appeal, I'd suggest you hit an issue. Sure. Thank you, Your Honor. The reason I was mentioning this is, in fact, there were the new designs included among things, the many things in the Monopoly board changes to such things as the transfers of money and the tokens and the game board itself and the properties and everything was changed. And the reason I wanted to bring that to your attention, of course, is because one of the measures of damages that Mr. Bowling must have obtained from the jury was based on the entire market value. Before I get there, I do want to address claim construction because that's the heart and soul of almost any patent case. And every single claim of the Bowling patent actually requires that certain facets be identically shaped and have the equal surface area. These claim terms are used in the specification, excuse me, in the claims without any kind of modification. They don't say substantially equal surface area. They don't say about equal surface area. They say equal surface area. And what we're asking this court to do is, in fact, find that the proper claim construction is what the spec says and what the claims say, and that is that certain facets have equal surface area. Why isn't the trial judge allowed to use common sense to exclude the difference in surface area, the minute difference in surface area, because the numeral two takes up less space than the numeral eight? The reason is that, in fact, throughout the spec, the specification itself, the words of the specification, talk about the importance of each of the facets having equal surface area. For example, the specification says that, and I'm quoting, that die 20 is constructed such that the center of mass of die 20 is in the precise center of symmetry. When going on to describe equal surface area, it states that no surface area has greater or less surface area than any other facet. That doesn't seem to tell us anything about whether the incursion into the surface to inscribe the numeral should be excluded from the calculation. The specification goes on when describing the drawings. It describes the drawings as having indicia thereon. That is, it's on the facet. A facet, of course, is a straight, flat surface, and it's on the facet. Now, here's a bit of a nuanced point, but I think it's very important, and that is they actually filed a continuation of this case, which was a design case. In the design case, they have absolutely nothing on the surfaces. They're perfectly flat. What that tells me is that if there's no new matter, it means that those had to have been flat in the previous case. What this court has said in Ray Daniels' case is that you can remove surface ornamentation and it not be new matter, but you can't take a change in geometry. You can't take purposeful, in the case of Hasbro, purposeful gouges and contours and make those flat and it not be new matter. If you take a look at the file history as a whole, including that design case, you would say that these surfaces had to be flat. I will also say that one of the frameworks that the district court used was incorrect, and I think it's what led to an incorrect decision. What the lower court did is it said, I'm not going to interpret these claims in any way that doesn't cover the commercial embodiment, for example. Now, that commercial embodiment didn't even exist at the time the patent application was filed. He also says that he's not going to interpret the claims to cover what he perceived to be in the drawings. But the specification itself says nothing about the possibility of using indentations in a die. One of the things that we did argue in the Markman is, in fact, not to use your own prejudices about playing Yahtzee in your own home, where you might see pips in a die, because, in fact, a fair-playing die is a term of art. A fair-playing die has a flat surface, and this court can actually take judicial notice of various laws. In Atlantic City, for example, you can't use a die that has pips. It has to have flat surfaces. And so when he talks about a fair-playing die, and he talks about the fact that the center of mass is precisely the center of symmetry, I think it's quite fair to interpret those as being flat surfaces. Counsel, I don't disagree with you that the specification doesn't discuss indentation. The district court said he looked at the figures, and clearly these are carved out or indented numerals. I guess he took from the shading that that's the case. My question to you is, is that a fact-finding by him? How do we treat that? Because, ultimately, this is part of claim construction, and that's a legal question. But it seems to me there could be underlying facts. So do I treat that as a fact-finding or a legal determination? His determination of what the figures disclose in the patent. That's a great question. I think claim construction is a question of law, as you know. I think it does seem to be a question of fact as to whether drawings show what one might think they show, although I haven't actually considered that issue. I will say that the drawings literally don't show any kind of indentation. You can close your eyes and put your fingers on them. You know that there's no indentation. But one of your Hasbro engineers, Eileen Shefchick, testified that when she looked at these drawings, they looked to be engraved. Yeah. She's actually the inventor of the Hasbro die. Even though I understand your argument that she's not one of skill in the yard or it hasn't been established that she is, why did you offer her testimony then? I'm just curious. What was the purpose of offering her testimony? I don't recall what her testimony. I think her testimony was that she was the inventor of the Hasbro die. But her statements about whether she thinks those drawings are indented or not indented is the opinion of one person, not an ordinary skill in the art. And it's actually contrary to the words of the specification, which talk about fair playing die. It talks about same surface area. When we talk about... Would a fair playing die be one where numbers are printed upon the die? Because the printing would certainly affect, in a minuscule fashion, but nonetheless affect the weight, especially a number one versus a number ten. You've got a whole other numeral on that side. Yeah. The laws that address those issues say you have to have a flat face. And there's actually devices where you can determine whether something's a fair playing die. But so if printing would, in fact, not... If printing under your... What you're asking us to accept as the fair playing die discussion, this specification, it seems to me would exclude printing as well, which then leaves me with no way at all to reconcile every single figure and embodiment herein which has numbers on it. No, I wouldn't exclude printing. And I wouldn't exclude minuscule differences. And I wouldn't require somebody to take on an electron scanning microscope and fractal geometry to figure out whether two sides are the same surface area. In fact, printing and using the kinds of tolerances that people use to make die are perfectly acceptable. For example, we're not contending that each of the shapes of the Hasbro product aren't the same shape. We're saying that they're the same shape. If I could take a microscope, maybe I could find out that they're not absolutely and precisely identical. Sir, to be sure I understand your point. Your argument is limited to when the die, when the pips, whatever they're called on the die, are slightly indented. That, then, you say is excluded from the claim, even though it's not discussed in the specification. They're excluded because the specification, the claims in particular, call for each surface area being equal. Not substantially equal, not almost equal. It doesn't say perfectly flat. It says equal. They say equal surface area, yes. And, of course, surface area is the amount of paint, essentially, it would take to paint that surface. And those pips, particularly the difference between one and six, are actually quite significant. And so to say that for the judge to interpret the claim by not interpreting the claim, but actually essentially reading out a limitation is improper. What the judge said is that identically shaped and having equal surface area is, instead of defining, he says without regard to negligible variances in the surface area caused by indented addition. Identical in shape is in the claim. Pardon me? Identical in shape is in the claim. Yes, it is. So that's easy. Yes, it is. So it's two things. But that's not the question, right? No, it's identical shape and equal surface area. And the reason we raise them together, we're not disputing what identical shape is. It's, you know, using tolerances that die people make. Is it an identical shape or isn't it? But we're raising that with the court just to let you know these aren't the same limitation. They have to have the identical shape, basically the outside surface, but they must also have the same surface area. They can't have these purposefully built indentations that a die would have. And, again, this is a die that wouldn't even be legal in gambling, for example. But unless there's any other questions, I do want to quickly address a few other issues that we've raised. If I could turn to the marking issue quickly. Essentially, what we're asking for is a statutory construction. And instead of laying out in great detail, what I want to cut to the chase on is that it was first Mr. Bowling's murder to prove that he could not mark. And there isn't any evidence other than an unsubstantiated statement that the die did not lend itself to marking. I gather from the argument as you presented it in your briefs that the only thing that would meet your requirement would be if each die was marked. No, the die could have been marked. They could have put a sticker on the die. They could have put the die in packaging, which went to a consumer. They could have done what Hasbro did in its product. Hasbro had a little plastic bag around its die. They could have put a plastic bag and put a patent number on that. What we're contending is as a matter of law, their scheme of having these in bins in retail stores is not packaging, even if you trust that every one of those bins were marked. Now, there is substantial evidence to show that those bins, in fact, weren't marked. But packaging is an encasement that one brings with them home. And, in fact, for most products, you want to try to get the marking as far downstream as possible. And for something like a lotion or a powder or BBs, you can understand that that packaging is going to stay with that product for a long time. For a die, it's not. But at least you can put some packaging on it beyond being in a bin in a store. And on the issue of whether substantially all were marked, I will also say that the trial court did hear from one retailer who, in fact, stated that the way they put their die is they put them in a case in front of the store. And the most expensive die were on top. The cheaper die were on the bottom. And they were organized by number of sides and had nothing to do with the manufacturer. So if you wanted a cheap six-sided die, you go to this bin. If you want an expensive 20-sided die, you go to a completely different bin. Are you going to save any rebuttal time? Yes. You're down to a minute and a half. I am to my rebuttal. Let me just say one other thing. And I apologize. The button was a little bit hidden there. But the issue of damages is very important. And the issue of damages is important because in the toy industry, unlike any other industry, companies actually do license in. They take licensing extremely seriously. And there was testimony. Well, I will say there's two ways they could have come up with the number they came up with, the jury. But to be sure I understand your position, you're saying that this patentee is required to grant a license even though it wants to be in the business and make the product itself. And therefore, just compensation is a license fee. Just compensation is a reasonable royalty. I don't think even Mr. Bolling was contending that. You're saying it's a reasonable royalty even if the patentee is not licensing the product. Is that your position? Yes. There was no evidence that they were trying to get any kind of lost profit. And so the statute… But they refused a license so that we know they said, you know, buy it from us. I'm not sure that's actually correct. I think that there actually was a negotiation, which turned out to be a failed negotiation. But I'm not sure that they were saying they absolutely wouldn't license under any circumstance. But the reason damage is so important is that in order to show the damage that they got, they would have had to show that the dye was the basis for customer demand. And there's absolutely no evidence that it was the basis of customer demand. In fact, in the cheaper version of the product, there was displayed on the very front cover regular six-sided dye. And so to say that somebody looked at that and said, oh, I'm going to buy that because I'm going to divine that there's a fancy dye in there is just not credible. Time has expired. My time has expired. If there's no other questions, I will sit down and I apologize for going over my time. Thank you. Ms. Zimmerman. Thank you, Your Honor. May it please the Court. With knowledge of bowling's patent, Hasbro sold more than $12 million worth of games containing infringing dice. And for that infringement, a jury awarded bowling a 4% royalty, resulting in a little less. We know what the facts are. Why waste time on telling us what we already know? It seems like what you should do is respond to what he just said. And that's exactly what I'm going to do. Thank you, Your Honor. At the district court level, the claim construction of equal surface area that Hasbro asked the district court to adopt was, quote, each extension member facet has the same or substantially the same surface area measured as the surface of a three-dimensional object. Now, that's a different construction than the one that they're asking this court to adopt when they're asking for the plain and ordinary meaning and saying that that plain and ordinary meaning cannot include words of approximation such as substantially. But at the district court level, Hasbro's proposed construction did include the term substantially. And so? And they're judicially stopped or we should ignore it or what are you saying? I'm simply saying that having not asked for a different construction at the district court level, they should not be permitted to ask for one on appeal. But in any event, the district court did construe... If their argument is there's only one correct construction and this court is obligated to issue the correct construction, then why shouldn't they be allowed to request the correct construction, even if it's different from what they said below? Well, this court's precedent has said that arguments not raised at the district court level should not be permitted on appeal. However, even if you ignore what they asked for at the district court level... It's not an absolute rule. We generally don't let people sandbag the trial forum by presenting a significantly different approach on appeal. But it's not an iron rule and lots of times we allow people to make new arguments on appeal. And if that's the case here, the district court correctly construed the term equal surface area to be equal without regard to the negligible variances caused by indented indicia. The specification of the 1-9 patent depicts dice that have facets with indented indicia and in the specification... Let's talk about that for a second. I want to ask you the same question that I asked opposing counsel, which is the district court found that these figures disclosed indentations. Is that a fact finding or part of the legal analysis incident to claim construction? Your Honor, I think that it is for the district court to determine what the patent discloses to one of ordinary skill in the art. I think that in any case that a judge is attempting to determine what the patent specification discloses to one of skill in the art, there are probably some factual issues inherent in that. That's why judges are permitted, district court judges are permitted, to consider in certain cases extrinsic evidence of the meaning to one of skill in the art as well as testimony of those of skill in the art. I'm not asking you if there may be some fact findings, I'm asking you if this is one. Is the determination of whether this picture depicts indentation rather than printing, is that a fact finding? I think it is a finding that is a part of the legal claim construction process, but that requires the judge to look at the specification and understand what it's disclosing to one of skill in the art. In this case, I think you don't have to be skilled in the art to look at these figures and see that they show three-dimensional indented indicia. In fact, if you look at the die in figure one and you look at that first number that's facing directly upward as the number three, there is no shading on that number because you're looking directly down at it and so you're not seeing the walls, the side walls. But if you look at the two numbers that are on the sides where the sides of the dice are moving away from you, in those numbers you can see the side walls as you're looking at it because if you were looking at those from above, you would look down and see the side walls. The only reason that those drawings would be made that way with no side walls on the numbers that are facing directly up toward the viewer and side walls to show the depth on the numbers that are on the other parts of the dice would be to show that these indicia are indented. So it sounds like what you're saying translated a little bit is that the district court made what I think you agree with Judge Moore could be fairly characterized as a fact-finding about what the drawing shows. And rather than, I guess because of cyborg, arguing for some sort of deference to that fact-finding, you're asking us to make a fact-finding and look at the picture and interpret it the way you interpret it. It seems like there's a serious issue in this case as to what respect or deference for fact-findings or close analogs made by a district court should be afforded by this court. Well, and I think that this court's precedent is clear that the district court hears all of the evidence. The district court heard testimony from people of skill in the art at the Markman hearing. The in-bank decision in cyborg said any supposed, this is all close to verbatim, any supposed fact issue is subsumed in the overall legal issue of what the claim term means. Now, most people have interpreted that to mean there are no fact issues in claim construction because they're subsumed so they don't exist. Judge Moore asked, is there a fact issue here? I thought you said, well, yeah. Not exactly. What I think the issue is here, the reason that this court's cases on this issue discuss whether it's a fact or law issue is because of the standard of review, which in claim construction is de novo because it is determined to be a matter of law for the district judge to decide. Maybe it shouldn't be de novo if the construction depends on a fact finding. I think either way that you review the decision in this case, it's clear that the district court construed this claim term under the only definition that the specification supports. The specification does not anywhere support the hyper-technical analysis that Hasbro entered into. You have to consider it. His argument is that it has an unqualified requirement having to do with surface area. And so for you to say, well, it doesn't say otherwise seems to not be responsive. He's saying it should be taken literally. The words have no qualification. Therefore, the surface area should have to be exactly, precisely equal. Your Honor, I think respectfully this court's precedent has said that when interpreting the claim terms of a patent, you need to consider the context. What is this product? Are we talking about semiconductor wafers? Does that mean that it's all right for a district judge to say, approximately is not in the claim phrase as a modifier, but because of my understanding of the context, I can interpret the claim as if it did read approximately equal surface area. And I don't think that's the way that the district judge did interpret this claim. I think that he said this specification makes it clear that dice have indented indicia. And the fact that they have those indented indicia because- This goes back to the diagram. It does go back to the figures. It does go back to the figures, and it also goes to the evidence from Hasbro's own alleged dice designer, Ms. Subchick, who said that this does clearly show indented indicia. And at column four, lines 61 to 62, discussing figure one, the specification of the one- Some judges would say, I don't care what the witness says the figure shows. I can look at the figure, even an appellate judge, and I can see whether it shows indentation or not. Exactly, and I think in this case that to anyone it clearly shows the indentation, and the patent specification says that the dice depicted in figures one, six, and ten, and in fact all of the dice depicted in the figures, have indented indicia. So to adopt Hasbro's- Where does the specification say that all of the dice depicted in the figures have indented indicia? Well, regarding figure one, that's at column four, lines 61 through 62. What's the exact language? It says- Oh, I'm sorry. It doesn't say that they have indented indicia. That's what the question was. I apologize. I misunderstood. Referring to the dice with indented indicia, the specification explains that those dice have equal surface area. So the dice themselves are shown as depicted as having indented indicia, and the specification describes those dice- You keep assuming the question at issue. I mean, that's the difficult thing. You are walking in assuming that these figures have to universally be accepted by everyone as indicating indentation, and then you're saying, well, once you assume that fact, that's the very fact they're disputing, well then, when you make that consistent with the equal surface area, you win on claim construction. I don't think they would dispute that. I don't think that- Maybe I'm wrong. Maybe they still would. But their real dispute is these figures don't necessarily translate into indentations. In fact, they argue it's printed on and not indented. And so I think that is the crux of the problem, and you're avoiding it by kind of stepping over it. And so what I need to know is how in the world do I come to a conclusion that shading necessarily implies indentation? And I don't see anything in the spec that indicates that, and so I was kind of hoping maybe I missed something or- Your Honor, I can only give you what is in there, and what is in there is I don't think that it's shading. First of all, I think if you look at the figures closely, you'll see that the numerals that are facing directly toward the viewer actually don't have any indication of depth because you're looking straight down at it. You would not see the sidewalls. If you look at the other indicia that are on the sides that are going away from you, you can see not just shading, but in fact drafting skill done to show the depth, to show the sidewall that you would see on that indented indicia. Do you think it's appropriate for a court of appeals to be mired in this kind of minutia? I think that deference should be given to the district court's determination here. How are we allowed to do that in view of CYBOR, which says no deference because it's purely and completely an issue of law. So is the court on bond? As I said, either way, I think that the district court's decision is supportable. I agree that it is unfortunate that the court is mired in having to review this issue again and determine whether the indicia are indented, but whether it reviews it de novo, it's self-evident from these drawings. The evidence in the record from the subject says that they are depicted as indented, and if you review the district court's decision on that with deference, then it's even more supported by the record that we have here. What's your answer to the question of whether the district judge isn't reading in a qualifier of approximately or substantially or nearly, whereas Mr. Cornwell says no such qualifier appears and therefore there should have to be absolute equality of surface area? Well, the court didn't need to read in a word of substantially. The district judge said it's negligible. The difference in surface area is negligible, and therefore I can ignore it. But linguistically, that's the same as inserting the word substantially before equal surface area. I don't think so. I think in this case that because the figures show dice with indented indicia and because the specification says those dice have equal surface area, those dice are fair-playing dice, the specification defines those dice depicted in those figures as having equal surface area as being fair-play dice. So to say that it can be of equal surface area and be fair-play dice without having to modify the words equal surface area in the claims is I think just consistent with what the specification says. If dice with indented indicia are dice that have equal surface area for purposes of this invention, as the specification teaches, then there's no need to read in the word substantially because those are equal surface area. To read in the word substantially equal surface area would potentially- Does this argument free you from dependence on somebody interpreting the figures? Is this based purely on words? I think that the argument is based on the specification and what it discloses. But I'm asking you, is it the words in the specification or is it the combination of the words and the figures? I believe it's the combination of the words and the figures. So then you are critically dependent on our interpreting the figures the same way you do. I think that that's true. I'm surprised to hear you say that because I would have thought you'd say even under their construction, printing is on the surface and printing by itself would also have an effect on the notion of this being a fair-playing dice so I would think that your argument would be under any set of rules, a fair-playing die was not meant to be absolute because even if we construe this as printing rather than indicia, it's still not purely, absolutely fair-playing. Well, and I would agree with that. I think that, as I said before, you have to construe the claim terms of the patent in the context of the technology here. And here we're talking about dice for game playing, not semiconductor wafers. The level of precision required in dice for game playing is obviously different and in this case there is testimony that was made of record that these little pips or the indentations caused by the pips or numbers on the sides of the die don't affect the playing of the die in any substantial way. Obviously Hasbro or any other game maker wouldn't include dice in their games if they didn't function and they do all have pips. Now Mr. Cornwell argued that the entire market value rule had to have been in play here and in his argument was misapplied by the jury and not corrected by the trial judge. What's your response about the applicability on these facts of the entire market value rule? Well, I don't think that there's any legal entire market rule application here. The evidence of record in this case showed that the industry standard in the game industry was to calculate the royalty based on the net sales price of the game minus allowances. And Hasbro's Senior Vice President of Research and Development testified that the industry standard in the game industry is a 5% royalty. He calculated out the 5% royalty on the infringing games to be $550,000 approximately. If the games don't infringe, just the die infringes. Yes, but the evidence in the record, which was decided by the jury as a matter of fact, is that the method of calculating a royalty in the game industry is to base it on a percentage of the net wholesale price of the game. And Mr. Hurdle, Hasbro's expert, testified that he was not aware of a situation in which Hasbro had based a component royalty on the price of the game. However, as the district court noted in the motions for judgment as a matter of law, after trial a document was actually produced by Hasbro showing that it had in fact based a royalty for a die on the entire value of the game. And the fact of the matter is that the authoritative source on licensing in the game industry, which Hasbro's own expert referred to, said that in the game industry, the industry standard is to calculate the royalty based on the percentage of the price of the game. All right, time has expired. Thank you. Mr. Cornwell, we'll give you a minute and a half. Of the three you used your own vote to have. Worthy. I went over my time, but I appreciate that very much. As for the entire market value issue, Mr. Hurdle did in fact testify that there is a standard in the industry. And my opponent is correct. The standard in this industry is three to five percent for games. As I said, Hasbro licenses in a lot of games. But he also testified that for a component, it wouldn't be the entire market value. And in fact, in this particular case, there is zero evidence that that game was sold because of this particular die. As for the they did mention a post hearing license, because I'm not sure that. Is there any jury instruction regarding entire market value rule? I don't believe so. Did you object or in any way raise this issue below at the district court? I believe the jury instructions had a standard instruction relating to determining what a reasonable royalty was. And on the facts, Mr. Hurdle actually did a calculation where he took the value of the die. These dies, by the way, cost twelve point eight cents to Hasbro. And the value of them versus the value of all of these other components, which were actually also new, and then did a calculation and came up with, I believe, one point four cents per die for the expensive version and about one cent per die for the smaller version. Now, he did, to be fair, he did testify that that would be my starting point. That would be my standard starting point for licensing a component like this. And there are certain things that might weigh heavier and lighter. And so had the jury come back with with one and a half cents a die. I'm not sure we could be up here here arguing. All right. I think we have the case clearly in mind from both counsel. We'll take it under advisement. We thank you both. Thank you.